Pursuant to Ind.Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Nov 07 2012, 9:29 am

CLERK
of the supreme court,
court of appeals and
tax court

ATTORNEY FOR APPELLANT:

**MARCE GONZALEZ, JR.**
Dyer, Indiana

ATTORNEYS FOR APPELLEE:

**GREGORY F. ZOELLER**
Attorney General of Indiana

**JUSTIN F. ROEBEL**
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | | |
|---|---|---|
| JAMES C. SHIDLER, | ) | |
| | ) | |
| Appellant-Defendant, | ) | |
| | ) | |
| vs. | ) | No. 37A05-1204-CR-186 |
| | ) | |
| STATE OF INDIANA, | ) | |
| | ) | |
| Appellee-Plaintiff. | ) | |

APPEAL FROM THE JASPER SUPERIOR COURT
The Honorable John D. Potter, Judge
Cause No. 37C01-0906-FA-200

**November 7, 2012**

**MEMORANDUM DECISION – NOT FOR PUBLICATION**

**RILEY, Judge**

Appellant-Defendant, James C. Shidler (Shidler), appeals his conviction and sentence for conspiracy to commit murder, a Class A felony, Ind. Code §§ 35-42-1-1(1), -35-41-5-2.

We affirm.

ISSUES

Shidler raises three issues on appeal, which we restate as:

(1) Whether the State committed prosecutorial misconduct by urging the jury to convict him based upon the content of a videotape that was not admitted into evidence;

(2) Whether the State presented sufficient evidence to prove beyond a reasonable doubt that he committed conspiracy to commit murder; and

(3) Whether the trial court properly sentenced him.

FACTS AND PROCEDURAL HISTORY

On June 1, 2009, Kyle Cooper (Kyle) and his wife Deb (Deb), (collectively, the Coopers), had plans to meet their friends, Dick (Dick) and Chris Leach (Chris), (collectively, the Leaches), for dinner at a bar in Jasper County. Before they arrived at the bar, Dick asked Kyle if his daughter and son-in-law, Andrea Shidler (Andrea) and Shidler, respectively (collectively, the Shidlers), could join them for dinner. Kyle had known Shidler for several years because they had raced cars together, so he said it was okay.

2

The group ate at the bar and consumed several alcoholic drinks during dinner. Around 8:00 p.m., the Leaches left, and the remaining couples continued to drink beer and shots of alcohol. Eventually, Andrea became intoxicated and started "causing problems." (Transcript p. 116). She was dressed in a "revealing" outfit and had attracted the attention of fellow bar patrons. (Tr. p. 98). Shidler went over to talk to one patron who had taken too much interest in Andrea, and Kyle followed, telling the patron to "back off" because Andrea was married. (Tr. p. 98). After these events, Shidler began to argue with Andrea. At one point, Andrea left the bar and threw away her wedding ring. Kyle, Deb, and Shidler followed her out of the bar, and the couples began to fight. Shidler and Kyle punched each other, and Andrea hit Deb. Andrea continued to swing at Deb, but Deb grabbed her and pinned her to the ground. The fight ended when Shidler and Andrea left in their pick-up truck and the Coopers returned to the bar.

Ten or fifteen minutes later, Kyle saw Shidler's pick-up truck drive up to the bar again. He went outside and tapped on the truck's window, which Shidler rolled down. Kyle observed that Shidler was sitting in the driver's seat of the truck while a man, later identified as Joseph Miller (Miller), was sitting in the passenger seat and Andrea was asleep in the backseat. Kyle thought he saw Miller bend down and pull up an object that looked like a gun. He also thought he heard Shidler say "[t]hat's him. Shoot him." (Tr. p. 106). Kyle ducked and heard a shot coming from the truck. He ran around the truck towards the bar and heard additional shots. Deb testified that she heard at least three or

four shots while Kyle was attempting to get away from the truck. Once Kyle reached the bar, everyone inside locked the doors and called the police.

Police officers arrived at the scene and found a nine-millimeter Luger shell casing near the area where Shidler's truck had been parked; two grazing bullet marks on the outside of the bar; and a bullet impact in the sign by the bar's door. They also found a bullet in the bumper of a car parked about twenty feet past the bar and four additional nine-millimeter Luger shell casings about 400 feet down the street in the same direction Shidler had driven when leaving the bar. After Kyle returned home, he listened to the messages on his cell phone and found one from Shidler that said "hey man, call me back. If you want come outside, call me back." (Tr. p. 109). The message was time stamped as occurring on "Tuesday, June 2nd at 12:04 p.m."[1] (Tr. p. 109).

On June 4, 2009, the State filed an Information charging Shidler with Count I, conspiracy to commit murder, a Class A felony, I.C. §§ 35-42-1-1(1), -35-41-5-2; Count II, attempted murder, a Class A felony, I.C. §§ 35-42-1-1(1), -35-41-5-1; Count III, criminal recklessness, a Class C felony, I.C. §§ 35-42-2-2(b)(1), -35-42-2-2(c)(3)(A); and Count IV, assisting a criminal, a Class C felony, I.C. §§ 35-44-3-2, -35-44-3-2(2). On January 31 and February 1, 2012, a jury trial was held. The trial court directed a verdict in Shidler's favor on Count IV, but the jury ultimately found Shidler guilty on the three remaining Counts.

---

[1] Based on the context of the questioning, we believe this is a transcript clerical error and that the time was 12:04 a.m. rather than p.m.

On March 13, 2012, the trial court held a sentencing hearing and merged Shidler's convictions for conspiracy to commit murder and attempted murder. It sentenced him to thirty-four years for conspiracy to commit murder and four years for criminal recklessness, with the sentences to be served concurrently.

Shidler now appeals. Additional facts will be provided as necessary.

DISCUSSION AND DECISION

I. *Prosecutorial Misconduct*

The first issue Shidler raises relates to the State's use of a videotape that was not admitted into evidence. During Kyle's testimony, the State played a surveillance video recorded at the bar on the night of the shooting. As the video played, the State elicited testimony from Kyle regarding the events depicted, including commentary on what appeared to be "gunshots or muzzle flashes." (Tr. p. 107). The State subsequently referred to the video during its closing argument, stating: "You saw the video, and the video's not a close-up video, but I believe that the video shows two flashes which are consistent with muzzle flashes at the scene of this incident." (Tr. p. 89). The State also argued during its rebuttal argument:

> . . . but he became extremely agitated, and you could see that from the film clip. I mean there's pushing and shoving and he's moving around, and at some point, even though . . . Mr. Cooper didn't really remember this, there was a scuffle. You saw it. . . . It just so happens that we see gunshot flashes.

(Tr. pp. 200-01). Shidler now asserts that the State committed prosecutorial misconduct by referring to the video during its closing and rebuttal arguments as the video was never admitted into evidence.

When reviewing a claim of prosecutorial misconduct, we determine: (1) whether the prosecutor engaged in misconduct, and if so, (2) whether the misconduct, under all of the circumstances, placed the defendant in a position of grave peril to which he should not have been subjected. *Carter v. State,* 956 N.E.2d 167, 169 (Ind. Ct. App. 2011), *trans. denied.* The gravity of the peril turns on the probable persuasive effect of the misconduct on the jury's decision, not on the degree of impropriety of the conduct. *Id.*

Shidler's trial counsel did not object to the statements Shidler now argues amounted to prosecutorial misconduct. A claim of prosecutorial misconduct presented on appeal without a contemporaneous trial objection will not succeed unless the defendant establishes not only prosecutorial misconduct, but also the additional grounds for fundamental error. *Id.* at 170. For prosecutorial misconduct to be fundamental error, it must make a fair trial impossible or amount to a clearly blatant violation of basic and elementary principles of due process and present an undeniable and substantial potential for harm. *Id.*

Because it is well-settled that counsel may not comment in argument on matters not in evidence, we agree with Shidler that the State's argument was improper. *See Adler*

*v. State,* 242 Ind. 9, 12 (Ind. 1961).[2]  However, we do not find that the misconduct was so prejudicial that it rose to the level of a fundamental error.  We have previously emphasized that the fundamental error exception is "extremely narrow."  *Kindred v. State,* 973 N.E.2d 1245, 1252 (Ind. Ct. App. 2012).  Also, if there is overwhelming independent evidence of a defendant's guilt, we will deem an error made by the prosecutor during closing argument harmless.  *Hand v. State,* 863 N.E.2d 386, 394 (Ind. Ct. App. 2007).

Here, there is independent evidence that gunshots were fired.  Kyle testified that he heard Shidler say, "[t]hat's him.  Shoot him[,]" and that he heard several gunshots. (Tr. p. 106).  Likewise, Deb testified that she heard three or four shots, and police officers found physical evidence of gunshots at the scene.  They found a nine-millimeter Luger shell casing near where Shidler's truck had been parked; two grazing bullet marks on the outside of the bar; a bullet impact in the sign by the bar's door; a bullet in the bumper of a car parked about twenty feet past the bar; and four additional nine-millimeter Luger shell casings about 400 feet down the street in the same direction Shidler had driven when he left the bar.  In light of this evidence, the jury could have easily found that shots were fired even without seeing the videotape's depiction of gunshots or muzzle flashes.

_____

[2] The State argues that it is immaterial that the video was never admitted because it was a demonstrative exhibit that was discussed through testimony during trial.  However, we have held that a demonstrative exhibit, like all evidence, must be properly admitted before a party may mention it during closing argument.  *See Miller v. State,* 916 N.E.2d 193, 197-98 (Ind. Ct. App. 2009), *trans. denied.*  Moreover, while Kyle described the video in his testimony, it was not Kyle's testimony that the State referred to in its closing argument.  The State referred to the video itself.

Similarly, we conclude that the State's reference to the videotape's documentation of the fight outside the bar was harmless because Shidler does not dispute that he was involved in a fight; nor is the fight dispositive of the ultimate issue of whether Shidler committed conspiracy to commit murder. As a result, we conclude that the State's conduct during its closing and rebuttal arguments did not rise to the level of fundamental error.

## II. *Sufficiency of the Evidence*

Next, Shidler argues that the State failed to present sufficient evidence to support his conviction for conspiracy to commit murder beyond a reasonable doubt. Specifically, he contends that there was no evidence that the gun was pointed at Kyle when the shots were fired, and, thus, there was no evidence that he intended to commit murder. He also claims that there was no evidence that he and Miller had entered into an agreement to kill Kyle. In support of this argument, he points to Kyle's admission at trial that he was not sure he heard Shidler say the words "[t]hat's him. Shoot him." (Tr. p. 106).

In reviewing a sufficiency of the evidence claim, this court does not reweigh the evidence or judge the credibility of witnesses. *Perez v. State,* 872 N.E.2d 208, 213 (Ind. Ct. App. 2007), *trans. denied.* We only consider the evidence most favorable to the verdict and the reasonable inferences stemming from that evidence. *Id.* We will only reverse a conviction when reasonable persons would not be able to form inferences as to each material element of the offense. *Id.* at 212-13.

8

In order to convict Shidler of conspiracy to commit murder, the State was required to prove beyond a reasonable doubt that he "conspire[ed] to commit [murder] when, with intent to commit [murder], he agree[d] with another person to commit the [murder]," and that he "performed an overt act in furtherance of the agreement." I.C. § 35-41-5-2(a)-(b). A defendant is guilty of committing murder if he "knowingly or intentionally kills another human being." I.C. § 35-42-1-1(1).

## A. *Intent*

Turning to Shidler's first argument, that there was no evidence that he intended to kill Kyle, we note that a defendant's intent to kill may be inferred from the deliberate use of a deadly weapon in a manner likely to cause death or serious injury. *Bethel v. State,* 730 N.E.2d 1242, 1245 (Ind. 2000). Indiana courts have found sufficient evidence for conviction when the evidence indicates that a weapon was fired in the direction of the victim. *Id.* However, Shidler cites three cases in which our supreme court reversed attempted murder convictions due to a lack of proof as to the specific intent to kill— *Bethel, Keifer*, and *Pearson.*

In *Bethel v. State,* 730 N.E.2d 1242, 1245 (Ind. 2000), the supreme court found that there was no evidence Bethel intended to murder a convenience store clerk when, although Bethel's accomplice initially pointed a gun at the clerk, the clerk ducked down and did not see which direction the accomplice subsequently fired his gun. Also, there was no evidence of the amount of time that lapsed between when the accomplice pointed his gun at the clerk and when he fired a shot from the gun. *Id.* In the same case, the

9

supreme court held that there was sufficient evidence of Bethel's intent to kill a store customer because the customer saw Bethel's accomplice point the gun in his direction and heard two to three shots. *Id.* It was not dispositive that no bullets were found and no bullets hit the customer or the vehicle in which he was sitting. *Id.*

In *Kiefer v. State,* 761 N.E.2d 802, 803 (Ind. 2002), the supreme court found there was no evidence that Keifer had the intent to commit murder when he fired his gun near a juvenile walking down the road outside of his residence. The supreme court's decision was based on the factors that (1) Kiefer had not had a motive to kill the juvenile as he had not even known him; (2) his conduct had not been consistent with the intent to kill— namely, he had been standing in a well-lit area with four witnesses and had four rounds remaining in his gun that he could have also fired at the juvenile if he had intended to kill him; and (3) it was apparent Kiefer had merely intended to scare the juvenile as after the shooting Kiefer said, "that kid must be scared now," and then casually walked back to his home. *Id.*

Finally, in *Pearson v. State,* 523 N.E.2d 747, 749 (Ind. 1988), the supreme court reversed Pearson's conviction for attempted murder of his friend where the only evidence of intent was testimony from a police officer who saw Pearson holding the gun straight out and pointed towards his friend following a gunshot. *Id.* The supreme court reasoned that Pearson's conduct at the scene had not been consistent with that of a man who intended to kill. *Id.* at 750. Pearson had looked shocked and stunned after the shot and had not moved at first; he had known there was a police officer across the street prior to

the shot; and both he and his friend testified that they were friends and had not argued. *Id.* at 748, 750. In addition, the State did not present any evidence of the path of the bullet, and the police officer who saw Pearson had not witnessed him holding the gun before the shot. *Id.* at 749.

The circumstances underlying Shidler's conviction are not analogous to the circumstances in the foregoing cases. In *Keifer* and *Pearson,* the supreme court found that the respective defendants did not have motives to kill their supposed victims and that there was no evidence the defendants had intended to aim at the victims. Similarly, in *Bethel*, the supreme court found that Bethel did not have the intent to kill a convenience store clerk when there was no evidence that his accomplice pointed a gun at the clerk when he fired the gun and no bullets or evidence of bullet damage were found in the area surrounding the clerk. *Bethel,* 730 N.E.2d at 1244.

Here, both motive and the direction of the shots permit a reasonable inference of Shidler's intent to kill Kyle. Unlike all three cases, there was evidence that Miller shot a gun in Kyle's direction, as there were two grazing bullet marks on the outside of the bar and a bullet impact into the sign by the bar's door. Because Kyle testified that he ran towards the bar, it is evident that these bullets were fired in his direction. Further, Shidler's statement "[t]hat's him. Shoot him" is explicit evidence of his intent to kill. (Tr. p. 106). There was no evidence of intent to kill besides the shooting of a gun in *Bethel, Keifer,* or *Pearson.* Finally, although it is not an element of conspiracy to commit murder, we recognize, as the *Kiefer* court recognized, that the lack of motive may be a

11

significant exculpatory factor. *Keifer,* 761 N.E.2d at 806. We cannot find a lack of motive here because Shidler fought with Kyle shortly before the incidents underlying his conviction. Thus, in that respect, this case is distinguishable from *Keifer*.

In light of these factors, we conclude that the instant case is in line with our general rules that intent may be inferred from the deliberate use of a deadly weapon in a manner likely to cause death or serious injury and that there may be sufficient evidence to support a conviction when the evidence indicates that a weapon was fired in the direction of the victim. *Bethel v. State,* 730 N.E.2d 1242, 1245 (Ind. 2000). Miller deliberately used a deadly weapon and fired in Kyle's direction in response to Shidler's direction to "Shoot him." (Tr. p. 106). Accordingly, we conclude that the State presented sufficient evidence to prove beyond a reasonable doubt that Shidler acted with the intent to kill Kyle.

### B. *Agreement*

Next, Shidler challenges the sufficiency of the State's evidence that he and Miller had an agreement to kill Kyle. He argues that the State did not present any evidence to support the existence of an agreement because the only evidence the State produced was Kyle's testimony that he heard Shidler say "[t]hat's him. Shoot him," and he later admitted that he was not sure that was what he had heard. (Tr. p. 106).

In *Conn v. State,* 948 N.E.2d 849, 853 (Ind. Ct. App. 2011), we described the nature of evidence required to prove a conspiracy agreement as follows:

> A conspiracy entails an intelligent and deliberate agreement between the parties. But the [S]tate is not required to prove the existence of a formal

12

express agreement. It is sufficient if the minds of the parties meet understandingly to bring about an intelligent and deliberate agreement to commit the offense. . . . This may be inferred from the acts committed and the circumstances surrounding the defendant's involvement. Understandably, then, a conviction for conspiracy may, and often will, rest solely on circumstantial evidence.

Here, the circumstances as a whole support the inference that Shidler entered into an agreement with Miller. Following his fight with Kyle, Shidler left the bar and returned with Miller. In spite of the fact that Miller did not know Kyle, and therefore had no motive to shoot him, Miller fired not one, but several, shots at Kyle. Further, the State presented evidence that Shidler told Miller "[t]hat's him. Shoot him" immediately before Miller shot towards Kyle. (Tr. p. 106). Because we must interpret this evidence in the light most favorable to the trial court, we reject Shidler's argument that we should not consider this statement in light of Kyle's admission that he was not sure he heard it. *See Perez,* 872 N.E.2d at 213. Based on these factors, we conclude that the State did present sufficient evidence to prove that Shidler and Miller entered into an agreement to kill Kyle.[3]

### III. *Sentence*

Finally, Shidler argues that the trial court inappropriately sentenced him. His argument has two components. First, he argues that the trial court's sentencing statement did not include the reasons or circumstances for imposing his aggravated sentence.

---

[3] Because we find that Shidler's conspiracy to commit murder conviction was supported by sufficient evidence, we will not address his argument that his attempted murder conviction, which the trial court merged with the conspiracy to commit murder conviction, was not supported by sufficient evidence.

Accordingly, he contends that the statement does not comport with the requirements of *Anglemyer v. State,* 868 N.E.2d 482 (Ind. 2007), *clarified on reh'g,* 875 N.E.2d 218 (Ind. 2007), because it does not allow meaningful appellate review. Second, Shidler requests us to modify his sentence under Indiana Appellate Rule 7(B) in light of the nature of his offense and his character.

A. *Sentencing Statement*

In *Anglemyer,* our supreme court established that a trial court is required to enter a sentencing statement whenever imposing a sentence for a felony offense. *Id.* at 490. The statement must include a reasonably detailed recitation of the trial court's reasons for imposing a particular sentence. *Id.* If the trial court includes aggravating or mitigating circumstances in its sentencing statement, it must identify all the significant circumstances and "explain why each circumstance has been determined to be aggravating or mitigating." *Id.* When reviewing the sufficiency of a sentencing statement, we examine both the trial court's written and oral statements. *Gleason v. State,* 965 N.E.2d 702, 710 (Ind. Ct. App. 2012).

In this case, while the trial court did not list the aggravating and mitigating circumstances in its written sentencing statement, it elaborated the reasons and circumstances for imposing its sentence during its oral sentencing statement. Specifically, the trial court explained that Shidler had a history of two prior misdemeanor convictions, as well as a case pending in another county. Also, the trial court observed that Shidler had refused to take responsibility for his actions in prior cases and was

14

similarly refusing to take responsibility in the instant case. In light of these explanations, we cannot agree with Shidler that the sentencing statement merely recites a term of years without elaborating on the reasons for imposing his sentence.

### B. *Nature of Offense and Character of Offender*

With respect to Appellate Rule 7(B), Shidler contends that the trial court's sentence was inappropriate in light of the nature of his offense and his character. Under Indiana Appellate Rule 7(B), this court may revise a sentence authorized by statute if, after due consideration of the trial court's decision, the court finds that the sentence is inappropriate in light of the nature of the offense and the character of the offender. *Childress v. State,* 848 N.E.2d 1073, 1079-80 (Ind. 2006). Although we are not required to use "great restraint," we nevertheless exercise deference to a trial court's sentencing decision, both because App. R. 7(B) requires that we give "due consideration" to that decision and because we recognize the unique perspective of the trial court. *Stewart v. State,* 866 N.E.2d 858, 865-66 (Ind. Ct. App. 2007). The "principal role of appellate review should be to attempt to leaven the outliers, and identify some guiding principles for trial courts and those charged with improvement of the sentencing statutes, but not to achieve a perceived 'correct' result in each case." *Cardwell v. State*, 895 N.E.2d 1219, 1225 (Ind. 2008).

Shidler was convicted of conspiracy to commit murder as a Class A felony, which carries a sentencing range of twenty to fifty years and an advisory sentence of thirty

years.  I.C. § 35-50-2-4.  The trial court sentenced Shidler to thirty-four years, which is only slightly above the advisory sentence.

With respect to the nature of his offense, Shidler characterizes his actions as reckless rather than intentional and argues that he and Kyle were close friends who merely consumed too much alcohol.  We reject his first argument, as we have already found that he specifically intended to conspire to commit murder.  In addition, while it is true that Shidler's behavior might have been affected by his alcohol intake, the nature of his offense was nevertheless serious.  The evidence shows that Shidler specifically intended to shoot Kyle and that his co-conspirator fired not one, but several shots, towards Kyle and towards a bar populated with several patrons.  As one of these bullets hit the bar door and another hit a bar sign, additional bar patrons could have been injured or killed as a result of Shidler's actions.  In addition, it is relevant that Shidler escalated what was essentially a minor scuffle between friends into a potentially deadly attack.  This reaction was grossly disproportionate and unjustified.

Turning to his character, Shidler argues that his sentence was unduly harsh because he was only 27 years old at the time of his offense, only had two prior misdemeanor convictions, was gainfully employed, and has two children.  We are not persuaded by Shidler's arguments because, while we recognize that he does not have any prior felony convictions, he does have two prior misdemeanor convictions:  (1) operating a vehicle with a Schedule I or Schedule II controlled substance; and (2) domestic battery.  He was placed on probation for both convictions and violated the terms of his probation

five times during his two probationary terms. In fact, he was still on probation when he committed the current offense. We also find it persuasive that Shidler refuses to take responsibility for the instant offenses or for his previous domestic battery offense. Based on these factors, we conclude that Shidler's sentence was appropriate in light of his character, and we decline to revise his sentence under App. R. 7(B).

CONCLUSION

Based on the foregoing, we conclude that (1) the State's references to evidence that was not admitted into the record did not amount to fundamental error; (2) the State produced sufficient evidence to support Shidler's conviction for conspiracy to commit murder; and (3) the trial court properly sentenced Shidler.

Affirmed.

BAILEY, J. and CRONE, J. concur

17